IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH VANCEADKINS@SWVA-ARMS.COM THAT IS STORED AT PREMISES CONTROLLED BY GODADDY.COM, LLC. | Case No. ___7:21mj134___ <br><br> **Filed Under Seal** |

### AFFIDAVIT IN SUPPORT OF
### AN APPLICATION FOR A SEARCH WARRANT

I, Drew Effing, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant for information associated with a certain email account vanceadkins@swva-arms.com that is stored at premises controlled by GoDaddy.com, LLC, a web hosting company and email provider headquartered in Tempe, Arizona. The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require GoDaddy to disclose to the government copies of the information (including the contents of electronic communications) further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, the government-authorized persons will review that information to locate the items described in Section II of Attachment B.

2.      I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) and have worked in this capacity since March, 2020.  I am currently assigned to the Roanoke Field Office located within the Washington Field Division.  As an

ATF Special Agent, I have received training and experience regarding investigations involving firearms and narcotics trafficking and the possession of firearms by prohibited persons. As a result of my training and experience, I have learned methods commonly used by narcotics and firearms traffickers to engage in unlawful activity. I am familiar with evidence that is frequently indicative of narcotics trafficking, unlawful firearms possession and firearms trafficking.

3.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. §§ 922(a)(1), 922(a)(6), and 924(a)(1)(A), as well as 18 U.S.C. § 1343, have been committed by Christopher Devonte JOHNSON. There is also probable cause to search the information described in Attachment A for evidence of these crimes, as described in Attachment B.

## JURISDICTION

5.      This court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

2

## PROBABLE CAUSE

### CASE INITIATION

6.      Between 2020 and 2021, ATF submitted multiple queries to the Firearms

Transaction Center (FTC) of the Virginia State Police, seeking records of firearm transaction

approvals for Christopher Devonte JOHNSON based on purchaser background checks.

Records received from the FTC in response to these inquiries reflected approximately eighty-

one (81) different firearm transaction approvals for JOHNSON between February 10, 2019,

and May 12, 2021. Approximately seventy-seven (77) approvals were then linked to

transactions from several different Federal Firearms Licensees (FFL).

### SUMMARY OF INTELLIGENCE CONCERNING FIREARM PURCHASES AND RECOVERIES

7.      Based on these reports, ATF multiple sales reports, and ATF firearms trace

summaries, ATF obtained Form 4473 firearms transaction reports for JOHNSON's

purchases. According to these reports, JOHNSON purchased approximately one-hundred and

seventeen (117) firearms between May 3, 2017, and May 12, 2021.

8.      Based on my training and experience, I know that it is common for straw

purchasers to purchase multiple firearms of the same make, model, and caliber in a short

period of time.

9.      According to reports of JOHNSON'S firearm purchases, JOHNSON has

purchased a minimum of:

a.  Eleven (11) Taurus, model G2C, 9mm handguns

     i.  Three (3) purchased on 03/30/2019 from Doomsday Tactical

     ii. Two (2) purchased on 04/28/2019 from Doomsday Tactical

3

       iii.  Five (5) purchased on 05/04/2019 from SWVA Arms

  b.  Nine (9) Phoenix, model HP25 (or HP25 variant), .25 caliber pistols

       i.  Two (2) purchased on 08/26/2019 from SWVA Arms

       ii.  Two (2) purchased on 09/13/2019 from SWVA Arms

       iii.  Three (3) purchased on 09/18/2019 from SWVA Arms

       iv.  Two (2) purchased on 10/17/2019 from SWVA Arms

  c.  Four (4) Taurus, model Spectrum, .380 caliber pistols

       i.  Four (4) purchased on 10/17/2019 from SWVA Arms

  d.  Seven (7) Ruger, model LCP, .380 caliber pistols

       i.  Two (2) purchased on 12/11/2019 from SWVA Arms

       ii.  Four (4) purchased on 12/22/2019 from Commonwealth Arms

  e.  Eight (8) Glock, model 19 (or 19 variant), 9mm pistols

  f.  Three (3) Glock, model 43, 9mm pistols

  g.  Two (2) Ruger, model EC9S, 9mm pistols.

       i.  Both (2) purchased on 06/22/2018 from SWVA Arms

10.     Based on my training and experience, I know that when purchased firearms are later possessed by other individuals and/or recovered by law enforcement in other states, it can be an indicator of straw purchasing and/or firearms trafficking.

11.     Six (6) firearms purchased by JOHNSON have been recovered by law enforcement from crime scenes and from individuals suspected of criminal activity. Four (4) of the six firearms were recovered in Brooklyn, New York, one (1) in Greenland, New Hampshire, and one (1) in Roanoke, Virginia:

4

     a.   Glock, model 26, 9mm pistol, SN: BCXZ957 recovered 01/06/2019 in Roanoke, Virginia

     b.   Taurus, model G2C, 9mm pistol, SN: TLX60155 recovered 10/08/2019 in Brooklyn, New York

     c.   Taurus, model G2C, 9mm pistol, SN: TMB59909 recovered 10/17/2019 in Brooklyn, New York

     d.   Taurus, model Spectrum, .380 caliber pistol, SN: 1F031450 recovered 10/22/2020 in Brooklyn, New York

     e.   Ruger, model LCP, .380 caliber pistol, SN: 372297931 recovered 06/16/2020 in Greenland, New Hampshire

     f.   Smith and Wesson, model 642, .38 caliber revolver, SN: DLH9612 recovered 02/03/2021 in Brooklyn, New York[1]

12.     According to former SWVA Arms manager Walter Warner, JOHNSON worked as a contractor at SWVA Arms, selling firearms and as an "inventory specialist". JOHNSON's name appears in the "Transferor/Sellers Name" box on several Form 4473s, to include Form 4473s in which JOHNSON is also listed as the "Transferee/Buyer."

13.     ATF is actively investigating JOHNSON for suspected straw purchasing and engaging in the business of dealing in firearms without a federal firearms license in violation of 18 U.S.C. §§ 922(a)(1), 922(a)(6) and 924(a)(l)(A).

---

[1] This firearm was purchased second hand by JOHNSON from another individual.

## SUMMARY OF INTELLIGENCE CONCERNING FRAUD PERPETRATED ON SWVA ARMS

14.     In an interview with former SWVA Arms owner Vance Adkins, Adkins advised that in approximately March of 2021, he discovered fraudulent checks written by JOHNSON on the SWVA Arms' account. In performing a reconciliation of the SWVA Arms' account, he noticed a number of checks made out to JOHNSON, purportedly signed by SWVA Arms manager Walter Warner, that referenced specific firearms in the memo line. Adkins told investigators he cross referenced these checks with SWVA Arms' firearm Acquisition and Disposition logbook. Records of the acquisition of firearms from JOHNSON did not match the number of checks written to JOHNSON from the SWVA Arms account.

15.     Adkins advised that he pulled all checks written to JOHNSON from the SWVA Arms account and sent them to Walter Warner for review. Adkins stated Warner identified 26 checks that had been fraudulently written and signed by JOHNSON. In an interview with Warner, Warner told investigators he does not reference specific firearms in the memo line of checks, which is one of the ways he knew JOHNSON had written and forged his name on these checks. An example of one of the fraudulent checks is below.



Check: 1353 Amount: $813.00 Date: 4/23/2021 CHECK 1353

Warner confirmed that he did not sign these 26 checks written to JOHNSON.

16.     Adkins confirmed that the only people authorized to sign SWVA Arms checks
were he and Warner.

17.     Adkins told investigators the fraudulent checks written from the SWVA
Arms' account totaled approximately $30,000.

18.     Both Adkins and Warner told investigators that Warner confronted
JOHNSON about the fraudulent checks, and JOHNSON was terminated from employment at
SWVA Arms.

19.     Adkins stated that after being confronted by Warner, JOHNSON reached out
to him by email at Adkins' SWVA Arms email address, vanceadkins@swva-arms.com, and
admitted in that email exchange to forging the checks. Adkins stated JOHNSON agreed to
pay him back the $30,000.

20.     Adkins provided ATF with a copy of a "Confession of Judgment Promissory
Note" signed by JOHNSON on May 19, 2021. This Promissory Note states, in relevant part,
that JOHNSON promises to pay to Adkins $30,000 in principal and interest at 10% per year,
payable as follows:

       a.  $2,000.00 due on May 17, 2021;

       b.  $5,600 due on June 1, 2021;

       c.  $5,600 due on July 1, 2021;

       d.  $5,600 due on August 1, 2021;

       e.  $5,600 due on September 1, 2021;

       f.  $5,600 due on October 1, 2021.

7

21.     Adkins told investigators that GoDaddy is the provider of his email account vanceadkins@swva-arms.com and that he has maintained the emails he exchanged with JOHNSON.

22.     A preservation request was sent to GoDaddy on or about September 3, 2021.

23.     Investigators are actively investigating JOHNSON for wire fraud in violation of 18 U.S.C. § 1343.

## BACKGROUND CONCERNING WEB HOSTING

24.     Web hosting companies, such as GoDaddy, maintain server computers connected to the Internet. Their customers use those computers to operate websites on the Internet.

25.     In general, web hosting companies like GoDaddy ask each of their customers to provide certain personal identifying information when registering for an account. This information can include the customer's full name, physical address, telephone number and other identifiers, email addresses, and business information. Web hosting companies also may retain records of the length of service (including start date) and types of services utilized. In addition, for paying customers, web hosting companies typically retain information about the customers' means and source of payment for services (including any credit card or bank account number).

26.     Web hosting companies' customers place files, software code, databases, and other data on the servers. To do this, customers connect from their own computers to the server computers across the Internet. This connection can occur in several ways. In some situations, it is possible for a customer to upload files using a special web site interface offered by the web hosting company. It is frequently also possible for the customer to

8

directly access the server computer through the Secure Shell ("SSH") or Telnet protocols. These protocols allow remote users to type commands to the web server. The SSH protocol can also be used to copy files to the server. Customers can also upload files through a different protocol, known as File Transfer Protocol ("FTP"). Servers often maintain logs of SSH, Telnet, and FTP connections, showing the dates and times of the connections, the method of connecting, and the IP addresses of the remote users' computers (IP addresses are used to identify computers connected to the Internet). Servers also commonly log the port number associated with the connection. Port numbers assist computers in determining how to interpret incoming and outgoing data. For example, SSH, Telnet, and FTP are generally assigned to different ports.

27.    The servers use those files, software code, databases, and other data to respond to requests from Internet users for pages or other resources from the website. Commonly used terms to describe types of files sent by a server include HyperText Markup Language ("HTML") (a markup language for web content), Cascading Style Sheets ("CSS") (a language for styling web content), JavaScript (a programming language for code run on the client's browser), and image files. Web hosting companies frequently allow their customers to store collections of data in databases. Software running on the web server maintains those databases; two common such programs are named MySQL and PostgreSQL, although these are not the only ones.

28.    Web hosting companies sometimes also provide their customers with email accounts; the contents of those accounts are ordinarily stored on the web hosting company's servers.

9

29.     Web sites deliver their content to users through the Hypertext Transfer Protocol ("HTTP"). Every request for a page, image file, or other resource is made through an HTTP request between the client and the server. The server sometimes keeps a log of all of these HTTP requests that shows the client's IP address, the file or resource requested, the date and time of the request, and other related information, such as the type of Web browser the client uses.

30.     Web sites are often known to the outside world by a domain name, such as www.uscourts.gov or www.amazon.com. Domain names must be registered to particular individuals. Sometimes, web hosting companies offer customers the separate service of registering domain names. When that occurs, web hosting companies typically retain information related to the domain name, including the date on which the domain was registered, the domain name itself, contact and billing information for the person or entity who registered the domain, administrative and technical contacts for the domain, and the method of payment tendered to secure and register the domain name.

31.     In some cases, a subscriber or user will communicate directly with a web hosting company about issues relating to a website or account, such as technical problems, billing inquiries, or complaints from other users. Web hosting companies typically retain records about such communications, including records of contacts between the user and the company's support services, as well records of any actions taken by the company or user as a result of the communications.

## BACKGROUND CONCERNING EMAIL

32.     Based on my training and experience, I have learned the following about GoDaddy Email.

10

33.     In addition to being a web hosting provider, GoDaddy is also an Internet Email Service Provider which provides professional email services to include an "email that matches your domain." Subscribers obtain an account by purchasing one of several email packages at a monthly cost. If one purchases an email package, GoDaddy will enable the subscriber to create email addresses matching the website domain.  For example, the subscriber for https://swva-arms.com could set up email addresses ending in @swva-arms.com. Only a subscriber who has purchased an email package may then set up email addresses ending in @swva-arms.com, and they may set up as many different email addresses (e.g., admin@swva-arms.com, info@swva-arms.com, etc.) as their package permits; and no other member of the public could set up an email address ending with @swva-arms.com without the permission of the GoDaddy subscriber. As noted above, the IP addresses associated with both the web server hosting the http://swva-arms.com website and the mail server hosting affiliated email addresses (i.e., emails ending in @swva-arms.com) are both registered to GoDaddy.

34.     GoDaddy requests that its subscribers provide basic information, such as name, address, zip code, and other personal/biographical information.

35.     GoDaddy maintains electronic records pertaining to the individuals and companies for which they maintain subscriber accounts. These records include account access information, email transaction information, and account application information.

36.     Subscribers to GoDaddy email may access their accounts on servers maintained and/or owned by GoDaddy from any computer connected to the Internet located anywhere in the world. Subscribers may also access their accounts using a "smartphone" connected to the Internet.

11

37.    Any email that is sent to a GoDaddy subscriber is stored in the subscriber's "mailbox" on GoDaddy's servers until the subscriber deletes the email.

38.    When the subscriber sends an email, it is initiated at the user's computer or smartphone, transferred via the Internet to GoDaddy's servers, and then transmitted to its end destination. A copy of the email is saved in the users "sent" folder of their GoDaddy email account. Unless the sender of the email specifically deletes the email from the GoDaddy server, the email can remain on the system indefinitely. The sender can delete the stored email message thereby eliminating it from the email box maintained at GoDaddy, but that message will remain in the recipient's email box unless the recipient deletes it as well or unless the recipient's account is subject to account size limitations.

39.    A GoDaddy email subscriber can store files, including emails and image files, on servers maintained and/or owned by GoDaddy in his/her account or any other account to which he/she has access.

40.    Emails and image files stored on a GoDaddy server by a subscriber may not necessarily be located in the subscriber's home computer. The subscriber may store emails and/or other files on the GoDaddy server for which there is insufficient storage space in the subscriber's computer and/or which he/she does not wish to maintain in the computer in his/her residence. A search of the files in the computer in the subscriber's residence will not necessarily uncover the files that the subscriber has stored on the GoDaddy server.

41.    As explained herein, information stored in connection with an email account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each offense-element or alternatively, to exclude the innocent from further suspicion. From

12

my training and experience, I know that the information stored in connection with an email account can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, email communications, contacts lists, and images sent (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the account at a relevant time. Further, information maintained by the email provider can show how and when the account was accessed or used. For example, as described below, email providers typically log the IP addresses from which users access the email account, along with the time and date of that access. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the email account access and use relating to the crime under investigation. This geographic and timeline information may tend to either inculpate or exculpate the account owner. Additionally, information stored at the user's account may further indicate the geographic location of the account user at a particular time (*e.g.*, location information integrated into an image or video sent via email). Last, stored electronic data may provide relevant insight into the email account owner's state of mind as it relates to the offense under investigation. For example, information in the email account may indicate the owner's motive and intent to commit a crime (*e.g.*, communications relating to the crime), or consciousness of guilt (*e.g.*, deleting communications in an effort to conceal them from law enforcement).

42.    As set forth above, there is probable cause to believe that GoDaddy provides email service to vanceadkins@swva-arms.com. There is further probable cause to believe that the GoDaddy subscriber(s) that controls the https://swva-arms.com website also controls

13

all email addresses assigned on the GoDaddy swva-arms.com domain, including but not necessarily limited to vanceadkins@swva-arms.com. I further submit that there is probable cause to believe that JOHNSON, the target of this investigation, communicated with email address vanceadkins@swva-arms.com (hosted by GoDaddy) concerning fraudulent checks he wrote from the SWVA Arms' account, and that the email account vanceadkins@swva-arms.com may contain evidence of those crimes.

## CONCLUSION

43.       Based on the forgoing, I request that the court issue the proposed search warrant.

44.       Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. The government will execute this warrant by serving the warrant on GoDaddy. Because the warrant will be served on GoDaddy, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

## REQUEST FOR SEALING

45.       I further request that the court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

14

Respectfully submitted,

Drew Effing
Special Agent
Bureau of Alcohol Tobacco and Firearms

Subscribed and sworn to before me on ___September 15_____, 2021

*Robert S. Ballou*

UNITED STATES MAGISTRATE JUDGE

15